United States District Court
Western District of Texas
San Antonio Division

United States of America,
    Plaintiff,

v.

                    No. SA-19-CR-788-FB

QuantaDyn Corporation (3),
    Defendant.

### Factual Basis for Guilty Plea

Defendant QuantaDyn Corporation has agreed, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, to plead guilty to Count Two of the Indictment, which charges Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349 ("the Offense"). Defendant's attorney has explained all of the elements of the Offense to Defendant. If Defendant pleaded not guilty or persisted in a plea of not guilty, the Government would have to prove each and every element of the Offense to the unanimous satisfaction of a jury beyond a reasonable doubt.

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between Defendant and the United States, and they hereby agree and stipulate that the following information is true and accurate. Defendant admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Defendant acknowledges that, had this matter proceeded to trial, the United States would have proven beyond a reasonable doubt the facts alleged below and set forth in the criminal Indictment:

### Overview

Beginning in 2007 and continuing into 2018, as a part of a conspiracy and scheme to fix government contracts, to eliminate competition in contracting, to frustrate and defeat government contracting procedures, and to defraud and steal money from the government, Co-Defendant David J. Bolduc, Jr. ("Bolduc"), his company, Defendant QuantaDyn Corporation ("QuantaDyn"), and others paid $2,329,536.20 in bribes to Co-Defendant Keith Alan Seguin ("Seguin"), an Air Force civilian employee of the 502 Trainer Development Squadron ("Randolph Trainer Development" or "RTD") at Randolph Air Force Base near San Antonio, Texas, in return for Seguin's influence in obtaining government contracts and subcontracts for

**Factual Basis for Guilty Plea – QuantaDyn Corporation**                    **Page 1 of 22**

QuantaDyn, his facilitation of the contract fixing conspiracy and scheme described herein, and his allowing and colluding in the fraud against the United States.

During the QuantaDyn - Seguin relationship, QuantaDyn grew from five or six employees to more than fifty employees, and its revenues grew from less than $4 million per year to more than $20 million per year. Seguin used his influence as an Air Force employee to fix the award amounts and winners of federal contracts, to corrupt contracting processes, and to defraud the Air Force, General Services Administration (GSA), and companies competing for government contracts. Bolduc, QuantaDyn, and Seguin disguised and concealed millions in crime proceeds and profits with financial transactions that made the proceeds of graft appear to be legitimate revenue.

### Relevant United States Government Agencies

The Air Force is the aerial and space warfare branch of the United States armed forces. It is part of the executive branch of the government, within the Department of the Air Force and Department of Defense ("DoD").

The General Services Administration ("GSA") is an agency within the executive branch of the United States government. It acquires property and services for other government agencies.

The 502 Trainer Development Squadron ("Randolph Trainer Development" or "RTD") is an Air Force unit located at Randolph Air Force Base in the Western District of Texas. RTD procures and maintains simulator training systems, such as flight simulators, for Department of Defense agencies. It also assists with procuring simulator technology for authorized foreign militaries. RTD uses government contracts managed by GSA to acquire the technology and services that RTD provides.

### Procurement Process

Agencies often pay for goods and services, including the ones that RTD procures for them, using a Military Interdepartmental Purchase Request ("MIPR"). A MIPR is a method for one military organization to transfer funds to another.

GSA establishes standing contracts called "multiple award schedules" through which contractors supply goods and service at prices pre-determined by GSA to be fair and reasonable. Once a contractor receives a multiple award schedule, it is eligible to compete with other schedule holders for "orders" placed by government agencies. When awarding a particular order, GSA selects the schedule holder that offers the best value to the government; in other words, the schedule holder with the optimal price and the most capability. A schedule holder must certify annually that it determined the pricing of delivery orders, task orders, and modules independently and without intent to restrict competition.

Contracting Officers ("COs") are government employees authorized by law to bind the government to contracts. COs rely on client agencies for assistance with a variety of functions.

They include, among other things, estimating contract costs for comparison to proposals and quotes; critiquing contractor proposals and quotes; defining criteria for contractor selection; and monitoring contractor performance, verifying contractor invoices, and recommending modifications and amendments to contracts.

In order to provide that assistance, client agencies typically appoint one of their employees to serve as the Contracting Officer's Representative ("COR") on individual contracts. A COR is an individual, including a Contracting Officer's Technical Representative ("COTR"), designated to perform specific technical or administrative functions. CORs do not have authority to bind the government contractually.

An Independent Government Cost Estimate ("IGCE") is the government's own estimate of the cost that a contractor may incur in providing services and products to achieve the Government's objectives. The IGCE serves as a basis for reserving funds during acquisition planning; provides a basis for evaluating costs or prices proposed by a potential contractor; and serves as an objective basis for determining price reasonableness in cases where multiple contractors respond to a solicitation. The IGCE, including any supporting work sheets, are confidential. The government may not provide them or the information they contain to a potential contractor before the potential contractor prepares a proposal, or while it is preparing one.

The government is entitled to receive quality supplies and services at fair prices. Under normal market conditions, competing offers ensure that adequate value is received. The CO relies on the IGCE in determining the government's acquisition strategy and an estimated cost for the proposed effort.

### Defendant QuantaDyn Corporation

QuantaDyn, which was established and organized in November 2000 as a Virginia stock corporation, is a software engineering company that worked on RTD simulator projects. QuantaDyn was a prime contractor on smaller RTD contracts, but it earned most of its revenue as a subcontractor on larger RTD contracts. From 2008 through 2013, QuantaDyn had gross revenue of less than $4 million per year. Between 2013 and 2018, QuantaDyn's gross revenue grew to more than $20 million per year.

### Co-Defendant Seguin

Co-Defendant Keith Alan Seguin was a civilian Air Force employee at RTD from March 1989 through July 8, 2017. At RTD, Seguin was involved in the development and manufacture of simulators, primarily for aircraft and close-air-support training. He had authority to solicit and accept orders for simulator technology and support, and to promote and manage related contracts for the benefit of the United States.

RTD routinely appointed Seguin as the COR on contracts. By virtue of his positions as an Air Force employee and a COR, Seguin was a fiduciary of the United States. He was obligated to be honest and loyal, to safeguard Air Force property, and to disclose all facts that

the Air Force was entitled to know.

Simulation Fabrication Products was an assumed name that Seguin created in 2007. In 2008, Seguin formed Simulation Products LLC, a Texas limited liability company. In 2014, Seguin filed an assumed name document for Simulation Products in Comal County, Texas.

Epic1 Engineering Services was an assumed name that Seguin created in 2014. In February 2015, Seguin created Epic1 Engineering Service, LLC, a Texas limited liability company.

### Co-Defendant Fiuza Lima

Co-Defendant Rubens Wilson Fiuza Lima, a friend of Keith Seguin, resided in Georgia until 2012, when Seguin arranged a job for Fiuza Lima in Texas with a subcontractor on an RTD contract. Fiuza Lima formed Impex Import Export Inc. ("Impex") under an assumed name in 2010, and incorporated it in Georgia in 2012 as Impex Import Export LLC.

### Prime Contractors A and B

Prime Contractor A was a prime contractor on RTD contracts, task orders, delivery orders, and modules. In November 2012, Prime Contractor B acquired Prime Contractor A and changed its name. Prime Contractor A and Prime Contractor B routinely subcontracted work on RTD orders to QuantaDyn.

### Co-Defendant Bolduc

Co-Defendant David Joseph Bolduc, Jr. was an owner and the Director of Operations at QuantaDyn. He was also a close friend of Keith Seguin. Beginning in 2014 and continuing through July 2017, Bolduc served as QuantaDyn's Chief Executive Officer (CEO). According to email records, Bolduc and other QuantaDyn employees have communicated with Seguin via email since approximately September 2006.

### Government Contracts

The July 20, 2007 Boom Simulator (BOWST/BOSS) contract was awarded to QuantaDyn. Its purpose was to deliver simulators capable of training Air Force personnel in aerial refueling operations. (The "boom" is an extendable arm on the underside of a tanker aircraft that crew members use for transferring fuel to another aircraft.) Over time, the contract amount increased to $4,300,084, and the period of performance was from July 20, 2007 until September 30, 2010.

The December 15, 2009 Crew Resource Management Trainer contract ("CRMT contract") was a modification/increase to an existing delivery order contract held by Prime Contractor A. It included an RTD order of $1,471,630 for flight-simulator software and testing for trainers for KC-135R tanker aircraft and C-130 H2/J military transport aircraft. Prime Contractor A subcontracted the work to QuantaDyn at Seguin's request.

The Trainer Development IT contract ("TDIT contract") consisted of multiple task delivery orders and was held by Prime Contractor A. From May 2011 through June 2015, RTD ordered $13,224,165 in goods and service from Prime Contractor A through the TDIT contract. Prime Contractor A paid QuantaDyn approximately $8 million as a subcontractor.

GSA awarded the September 17, 2013, $413,395,584 Trainer Development 1 contract ("TD-1 contract") to Prime Contractor B at RTD and Seguin's request. Prime Contractor B subcontracted some of the work under the TD-1 contract to QuantaDyn. As of June 2019, GSA had paid $440,286,313 to Prime Contractor B. As of March 2019, Prime Contractor B had paid QuantaDyn $99,734,406.

## Summary of the Conspiracy

Beginning in 2006 and continuing until 2018, in the Western District of Texas and elsewhere, QuantaDyn conspired and agreed with Seguin, Bolduc, Fiuza Lima, and others, in violation of 18 U.S.C. §1349, to commit an offense against the United States, specifically wire fraud, a violation of 18 U.S.C. §1343. QuantaDyn, Seguin, Bolduc, and Fiuza Lima ("the Conspirators") agreed that, having devised a scheme and artifice to defraud the United States and to obtain money and property by way of false and fraudulent pretenses, representations and promises, they would, with intent to defraud, transmit and cause to be transmitted electronically in interstate and foreign commerce certain information for the purpose of executing their scheme and artifice.

The purpose of the conspiracy was to enrich the Conspirators at the expense of the military agencies that obtained simulator technology and services through RTD. In return for bribes from QuantaDyn, Seguin used his influence to persuade Prime Contractor A and later Prime Contractor B to award subcontracts worth tens of millions of dollars to QuantaDyn. As a reward for their preferential treatment of QuantaDyn, Prime Contractor A and Prime Contractor B received contracts from which they earned substantial profits even though they provided virtually no goods or services. An essential element of this scheme was the subversion of legally-required government contracting procedures that were designed to ensure that the government would receive quality supplies and services at fair prices.

Seguin illegally leaked confidential competitor proposals to Prime Contractor B in order to ensure that it would receive the prime contract and be in a position to subcontract the work to QuantaDyn. And Seguin illegally leaked confidential government budget information to Prime Contractors A and B, and QuantaDyn which enabled them to maximize their profits at the expense of the government. Seguin divulged confidential RTD and GSA contracting information to employees of the prime contractors and to Bolduc and others at QuantaDyn; fraudulently inflated independent government cost estimates; helped employees of the prime contractors to contrive fraudulent quotes to GSA that were roughly equal to the GSA/RTD budget amounts, rather than formulating honest quotes based on real labor hours, costs, and profit; and helped employees of the prime contractors to fabricate artificial labor hours, costs, and profit to approximate the GSA/RTD budgets that Seguin had improperly disclosed.

QuantaDyn, in return for the tens of millions of dollars that it received through this arrangement, paid Seguin roughly $2.3 million in bribes during the course of the conspiracy. Bolduc, acting on behalf of Quantadyn, personally signed QuantaDyn checks for most of the bribes, and Fiuza Lima assisted Seguin and Bolduc by laundering some of the money.

Meanwhile, QuantaDyn and Bolduc submitted quotes and claims to the prime contractors that were inflated by the bribes QuantaDyn paid Seguin. The employees of the prime contractors incorporated QuantaDyn's inflated quotes and claims into the prime contractors' quotes and claims to GSA/RTD. Seguin, as RTD contract manager and as a GSA COR, recommended approval of the prime contractors' proposals, quotes, claims and invoices, causing GSA to pay the inflated claims.

### Bribes to Co-Defendant Seguin

Bolduc, on behalf of QuantaDyn, paid or caused others to pay 47 separate bribes to Seguin between December 2007 and September 2016. The total amount of the bribes was $2,375,725.26. With only four exceptions, Bolduc paid the bribes with QuantaDyn checks, which he signed personally. (Bolduc arranged for another individual to pay the first four bribes through that individual's company.)

In order to disguise the bribes as legitimate payments for goods and services, Bolduc and Seguin agreed that the payments would go to companies rather than Seguin personally. The only exception was two payments in May and June 2008, while Seguin was going through a divorce, that were made directly to Seguin. Fiuza Lima owned and controlled one of the companies – Impex, Inc. Seguin owned and controlled the other three – Simulation Fabrication Products, Simulation Products, and Epic 1 Engineering.

The following is a list of the bribes that Bolduc paid or directed others to pay to Seguin:

| Date | Payee | Amount |
|------|-------|--------|
| 12/10/2007 | Simulation Fabrication Products | $9,000.00 |
| 01/26/2008 | Simulation Fabrication Products | $31,805.44 |
| 05/31/2008 | Keith Seguin | $32,084.03 |
| 06/05/2008 | Keith Seguin | $32,084.03 |
| 07/19/2010 | Impex, Inc. | $47,933.76 |
| 07/28/2010 | Impex, Inc. | $50,929.62 |
| 09/09/2010 | Impex, Inc. | $62,913.06 |
| 10/25/2010 | Impex, Inc. | $59,917.20 |

| Date | Payee | Amount |
|------|-------|--------|
| 12/06/2010 | Impex, Inc. | $62,913.06 |
| 12/15/2010 | Impex, Inc. | $50,929.62 |
| 06/21/2011 | Simulation Products | $30,000.00 |
| 06/28/2011 | Simulation Products | $30,000.00 |
| 09/15/2011 | Simulation Products | $15,000.00 |
| 11/16/2011 | Simulation Products | $15,000.00 |
| 03/20/2012 | Simulation Products | $45,000.00 |
| 04/02/2012 | Simulation Products | $27,000.00 |
| 04/27/2012 | Simulation Products | $15,000.00 |
| 05/07/2012 | Simulation Products | $15,000.00 |
| 05/16/2012 | Simulation Products | $45,000.00 |
| 06/11/2012 | Simulation Products | $37,500.00 |
| 08/21/2012 | Simulation Products | $25,000.00 |
| 10/30/2012 | Simulation Products | $28,000.00 |
| 02/08/2013 | Simulation Products | $23,000.00 |
| 04/01/2013 | Simulation Products | $28,000.00 |
| 04/23/2013 | Simulation Products | $40,000.00 |
| 05/20/2013 | Simulation Products | $44,000.00 |
| 05/28/2013 | Simulation Products | $40,000.00 |
| 06/26/2013 | Simulation Products | $56,000.00 |
| 06/26/2013 | Simulation Products | $60,000.00 |
| 07/26/2013 | Simulation Products | $61,509.44 |
| 02/28/2014 | Simulation Products | $60,000.00 |
| 03/02/2014 | Simulation Products | $60,000.00 |
| 05/07/2014 | Simulation Products | $40,000.00 |
| 06/23/2014 | Simulation Products | $40,000.00 |
| 11/28/2014 | Epic 1 Engineering | $200,000.00 |
| 02/17/2015 | Simulation Products | $25,000.00 |
| 05/11/2015 | Epic 1 Engineering | $40,000.00 |
| 08/18/2015 | Epic 1 Engineering | $59,435.00 |

| Date | Payee | Amount |
|------|-------|--------|
| 09/15/2015 | Epic 1 Engineering | $59,435.00 |
| 10/06/2015 | Epic 1 Engineering | $59,435.00 |
| 10/08/2015 | Epic 1 Engineering | $59,435.00 |
| 11/02/2015 | Epic 1 Engineering | $59,435.00 |
| 12/18/2015 | Epic 1 Engineering | $59,435.00 |
| 02/08/2016 | Epic 1 Engineering | $59,435.00 |
| 03/08/2016 | Epic 1 Engineering | $209,746.00 |
| 05/02/2016 | Epic 1 Engineering | $104,980.00 |
| 07/13/2016 | Epic 1 Engineering | $59,435.00 |

## BOWST/BOSS Contract and Simulation Fabrication Products

On May 17, 2007, in connection with the BOWST/BOSS contract, Seguin acknowledged in writing his duty to report any real, apparent, possible, or potential conflicts of interest to the government. Between May 17, 2007 and July 6, 2007, as a member of the BOWST/BOSS source selection committee, Seguin reviewed the BOWST/BOSS contract proposals and rated QuantaDyn's proposal as "meets" and "exceeds" the requirements. QuantaDyn received the contract on July 20, 2007.

On July 13, 2007, Seguin established Simulation Fabrication Products, an assumed name, in Comal County, Texas. In August and September 2007, Bolduc, another QuantaDyn employee, Seguin, and a Tampa, Florida subcontractor to QuantaDyn on the BOWST/BOSS contract made plans for Simulation Fabrication Products to receive more than $100,000 from QuantaDyn. They created a purported contract between QuantaDyn and the Tampa company, under which QuantaDyn would pay $115,500 to the Tampa company; it would keep only $10,500; and it would pay the remaining $105,000 to Simulation Fabrication Products.

In furtherance of the scheme and conspiracy, on October 14, 2007 the Tampa company sent and caused to be sent, by email from Florida to Texas, a purchase order in the amount of $105,000 to Seguin and Simulation Fabrication Products. Seguin's emails and financial records do not reflect that Seguin or anyone purporting to work for Simulation Fabrication Products performed actual work for the Tampa company or spent money on any materials, labor, or travel related to the Tampa company. Additionally, QuantaDyn is not aware of any evidence that would support the matters described in the Simulation Fabrication Products invoices.

Between August 1, 2007 and December 12, 2007, QuantaDyn submitted five invoices to the DoD for work purportedly performed under the BOWST/BOSS contract. As of December 12, 2007, the DoD had made five payments to QuantaDyn totaling more than $120,000.

On December 10, 2007, Seguin opened an account for Simulation Fabrication Products at a Credit Union in San Antonio, Texas. On the same day, Seguin deposited a $9,000 payment from the Tampa company into the account.

On January 14, 2008, in furtherance of the scheme and conspiracy, Seguin sent and caused to be sent, in interstate commerce, an email message from Texas to the Tampa company concerning money being sent to the Tampa company by Bolduc/QuantaDyn; and the Tampa company responded that it would "turn it around as soon as we get it." On January 26, 2008, Seguin deposited $31,805.44 from the Tampa company into Simulation Fabrication Products' credit union account.

By June 5, 2008, the Tampa company had paid Seguin $104,973.50 of the promised $105,000.00.

### CRMT Contract and Impex, Inc.

On March 10, 2009, Seguin suggested to an employee of Prime Contractor A that it take on the CRMT contract, provided that it would, as the prime contractor, pass through the bulk of the contract work to QuantaDyn.

From August through December 2009, as reflected in email communications, Seguin and a QuantaDyn software engineer and co-owner collaborated in drafting the statement of work that would later be included in the CRMT contract. They included a requirement that the prime contractor purchase up to 200 computer systems, not to exceed $350,000, from a recommended source, "Simulation Products," Seguin's company.

On December 9, 2009, Seguin sent an email to an employee of Prime Contractor A, with copies to QuantaDyn, that included the confidential independent government cost estimate (IGCE) and the Military Interdepartmental Purchase Request (MIPR) documents that had been prepared in preparation of the CRMT contract. In the email, Seguin referred to the cost estimate as "the brakedown [sic] I have worked out with Quantadyn," and stated that "the plan will be" to sole-source the CRMT subcontract to QuantaDyn.

On December 15, 2009, as requested by Seguin and RTD, the Army Communications Electronics Command (CECOM) at Fort Monmouth, New Jersey awarded the $1,212,000 CRMT contract to Prime Contractor A by modifying/increasing an existing CECOM delivery order contract held by Prime Contractor A.

As previously agreed, Prime Contractor A subcontracted the CRMT contract work to QuantaDyn for $1,091,776, which was ninety percent (90%) of the full contract amount. QuantaDyn's proposal to Prime Contractor A included $344,525 for computer hardware, consistent with the requirement, co-authored by Seguin and QuantaDyn's software engineer, for Simulation Products to be paid approximately $350,000 for computer equipment.

In furtherance of the scheme and conspiracy, on March 30, 2010 Seguin sent and caused to be sent in interstate commerce an email from Texas to Fiuza Lima in Georgia. In

the email, Seguin sought Fiuza Lima's assistance with laundering money that Seguin expected to receive from QuantaDyn. Also on March 30, 2010, Fiuza Lima, through his company Impex Inc., submitted to QuantaDyn and Bolduc a quote for work to be performed on the CRMT contract. Seguin had prepared the quote. The amount was $344,523.90.

Subsequent emails between Seguin, Fiuza Lima, and Bolduc on behalf of QuantaDyn clarified the plan. There would be three payments from the CRMT contract to Seguin, the first being $98,863.38. The next two payments would be $122,830.26 each. The sum of the three amounts equaled $344,523.90.

On May 9, 2010, in furtherance of the scheme and conspiracy, Seguin sent or caused to be sent, in interstate commerce, from Texas to QuantaDyn in Virginia, an e-mail message containing an Impex invoice for $98,863.38. On July 30, 2010, Seguin opened a checking account at a credit union in San Antonio, Texas in the name of Simulation Products, LLC, and on July 31, 2010, he deposited a check from Impex, Inc. into the newly established account. (On August 15, 2008, Seguin filed papers forming Simulation Products, LLC, a limited liability company.)

Impex, Inc. banking records reflect six (6) deposits of funds from QuantaDyn totaling $335,536.32. Simulation Products, LLC banking records reflect six (6) deposits of funds from Impex, Inc. totaling $301,907. Specific transactions include the following. On December 6, 2010, QuantaDyn sent a payment in the amount of $62,913.06 to Fiuza Lima and Impex, Inc. On December 18, 2010, Fiuza Lima and Impex, Inc. sent Seguin and Simulation Products, LLC a check for $56,621.75. On January 3, 2011, Seguin deposited $56,621.75 into his personal bank accounts and the Simulation Products, LLC account.

Over the course of the CRMT contract, QuantaDyn made a profit of $103,857.02 in addition to the amounts paid to Impex Inc. and Seguin/Simulation Products, LLC.

### TDIT Contract and Simulation Products, LLC

Seguin initiated three multiple task deliveries ("TDs") for RTD through the TDIT contract: TD-079, TD-114, and TD-215. Prime Contractor A, acting on previous discussions with Seguin and others, subcontracted the work to QuantaDyn. These multiple task delivery contracts would later be assumed by Prime Contractor B.

### TD-079

TD-079 was a May 2, 2011 task delivery order in the amount of $3,102,850 that required the development, integration, fabrication, testing, and delivery of 17 Micro Boom Operator Simulation System (BOSS) table top training simulators, 8 Micro BOSS table top Image Generators, one BOSS visual upgrade kit, and supporting technical manuals. QuantaDyn and another company were subcontractors under this task delivery. The project was completed and closed in September 2012. QuantaDyn received $1,767,700 as a subcontractor.

On February 21, 2011, prior to the award of TD-079, Seguin emailed Bolduc concerning work required for TD-079. Seguin stated he would add $6,000 to Bolduc's number for the "custom grips" for the Micro BOSS simulators, thereby increasing the government's price per unit. Seguin added that his company, Simulation Products, LLC, would provide 20 units of custom grips. Seguin was informing Bolduc that he would have to pay Seguin $120,000.

Neither Seguin nor any or his companies purchased any equipment, including grips. GSA contract file records and emails from a Prime Contractor B employee reflect that a different subcontractor working with Prime Contractor A provided the grips in October 2011 and March 2012.

On June 6, 2011, Seguin, using Simulation Products, LLC, sent QuantaDyn an invoice for 17 units of custom grips at $6,000 each ($102,000 total) for TD-079. On June 21, 2011, Bolduc, acting on behalf of QuantaDyn, sent Simulation Products, LLC a check for $30,000 as partial payment. Seguin deposited this check on July 23, 2011. By December 2011, QuantaDyn had made four (4) payments to Seguin/Simulation Products, LLC totaling $90,000.

**TD-114**

At the request of Seguin and RTD, on September 28, 2011 GSA issued a modification to the TDIT contract and added TD-114. It provided Prime Contractor A with $919,144 for onsite personnel at Randolph AFB, Texas to plan, manage, and budget I.T. projects for RTD, and to continue the procurement of 5 Micro BOSS table-top training simulators and 40 BOSS Stick Grips referenced under TD-079. Prime Contractor A, acting on previous discussions with Seguin and others, used QuantaDyn to assemble the Micro BOSS simulators and a different subcontractor to acquire the 40 BOSS Stick Grips.

By August 2012, contract modifications had increased the allocated funds to $4,222,136 for TD-114. With these modifications, an additional subcontract was awarded to QuantaDyn to design, integrate, and deliver hardware and software for the Air National Guard Advanced Joint Terminal Attack Controller Training System (AAJTS) through February 2014. QuantaDyn was to create a prototype AAJTS simulator.

On December 9, 2011, Seguin emailed Bolduc and said he was raising the amount of the payments he expected from QuantaDyn. Seguin told Bolduc there were 32 orders to purchase Micro BOSS table-top training simulators, including 17 Micro BOSS table-top training simulators previously ordered under TD-079, and that the new total "for all units" QuantaDyn had subcontracts to produce required "40 grips/grip sets." The amount of the payment Seguin/Simulation Products, LLC expected from QuantaDyn increased to $7,500 per each grip/grip set. QuantaDyn would have to inflate the cost of materials that it quoted to Prime Contractor A to $7,500 to cover Seguin's request.

On March 20, 2012, Seguin sent an email to Bolduc that contained a spreadsheet of the grip prices. Seguin also included a Simulation Products invoice/quote reflecting a price of $7,500 per unit. Based on Seguin's calculations in the spreadsheet, QuantaDyn was to pay

Seguin a total of $274,500. From March 2012 through August 2012, Bolduc and QuantaDyn made seven (7) payments to Seguin/Simulation Products LLC, totaling $209,500 for the "grips/grip sets." Seguin's emails, financial accounts and other documents do not reflect that Seguin or anyone purporting to work for Simulation Products LLC actually performed work or spent money for materials, labor, or travel related to the invoice to QuantaDyn for the grips/grip sets. Additionally, QuantaDyn is not aware of any evidence that would support the matters described in the Simulation Products, LLC invoices.

### TD-215

On September 25, 2012, GSA made a modification to the TDIT contract, adding TD-215, valued at $5,899,178. For this amount, Prime Contractor A would provide onsite personnel at Randolph AFB, Texas; continue the development of the prototype AAJTS simulator via a subcontract to QuantaDyn; procure 16 different Joint Terminal Attack Controller (JTAC) simulator systems via a subcontract with another subcontractor; and procure a Helmet Mounted Integrated Targeting System for integration into an F-16 Fighter Jet training simulator. Besides QuantaDyn, two other companies were subcontractors under TD-215. QuantaDyn was paid $3,658,711 from TD-215 by Prime Contractors A and B.

On October 1, 2012, Seguin, on behalf of Simulation Products, LLC, sent an Invoice in the amount of $116,000 for eight (8) IG Chassis to QuantaDyn as part of TD-215. On October 29, 2012, QuantaDyn, after approval from Bolduc, sent a Purchase Order to Simulation Products, LLC for eight (8) IG Chassis in the amount of $116,000.00. Financial records for Seguin and Simulation Products LLC do not reveal the expenditure of money for materials, labor or travel related to any IG chassis. Additionally, QuantaDyn is not aware of any evidence that would support the matters described in the Simulation Products, LLC invoices.

In furtherance of the scheme and conspiracy, on February 27, 2013 Bolduc, located in Virginia, and Seguin, located in Texas, exchanged text messages. Seguin implied that he worked late because he was trying to make money for Bolduc. Bolduc instructed Seguin to check the "SP inbox," referring to an email account that Seguin controlled on behalf of Simulation Products LLC. Bolduc told Seguin to "thank me" after Seguin checked. Bolduc then told Seguin, "you make me money and I won't mention your butt to anyone."

At the time, Seguin was working with Bolduc and another QuantaDyn employee to establish the AAJTS Low Rate Production (LRP) sales prices. Seguin also sought Bolduc's assistance with the independent government cost estimates. Seguin was also working to obtain purchase commitments from Headquarters Air Force (HAF) to buy the AAJTS devices through the GSA contract that Seguin was working to establish.

QuantaDyn was still a small software development company with no more than 10 employees. Most of its revenue came from subcontracts in support of the Air National Guard. QuantaDyn needed work and funds from the AAJTS production contract to grow, and it needed Seguin's help and influence to get that work and those funds.

Statements from accounts held by Simulation Products, LLC, QuantaDyn, and Seguin, as well as emails contemporaneous with the TDIT contract, reveal that QuantaDyn made thirty-four (34) payments to Seguin/Simulation Products, LLC between June 21, 2011 and June 23, 2014, totaling $880,009.44, in return for government contracts that Seguin was able to steer to QuantaDyn through Prime Contractor A and Prime Contractor B. During this same time, QuantaDyn earned profits of $604,669.82.

## TD-1 Contract

At RTD, the TD-1 contract was known as Seguin's contract. In September 2012, a year before the TD-1 contract was awarded, Seguin's emails revealed his plan to use the GSA Alliant GWAC contract system exclusively to support RTD's mission. Seguin estimated the contract would have a $495M ceiling over a five-year period.

Months before GSA solicited proposals for the $413 million TD-1 contract, Seguin worked with Bolduc and another owner of QuantaDyn to establish the AAJTS Low Rate Production pricing for a quantity of 10 AAJTS devices QuantaDyn intended to sell to the government. In March 2013, Bolduc believed AAJTS was QuantaDyn's "last chance to make money." Bolduc and another owner of QuantaDyn prepared brochures and sales information for Seguin to use to promote the AAJTS to prospective government and Foreign Military Sales buyers. Seguin, QuantaDyn's owners, including Bolduc, and QuantaDyn's subcontractors were enthusiastic about the millions in income that QuantaDyn would derive from manufacturing AAJTS simulators and supplying supporting personnel to maintain the simulators.

Email communications reveal that Seguin and Prime Contractor B employees agreed, before the contract was awarded, that Seguin would designate projects to be awarded to QuantaDyn, and Prime Contractor B would accept a percentage of the contract funds in return for passing the bulk of the contract funds and work to QuantaDyn. Prime Contractor B was to receive five percent of the funding for each module that Prime Contractor B sole-sourced to QuantaDyn, but it ended up receiving ten percent.

Email communications also revealed that Seguin, Prime Contractor B employees, and Bolduc collaborated to eliminate competition and fix prices by sharing the government's confidential budget figures and plans, sharing the "independent" government cost estimates, and perpetuating the ongoing pass-through arrangement whereby Prime Contractor B took a percentage fee to pass the work and money through to QuantaDyn.

## The (JTC TRS) Program

As plans to develop the TD-1 Contract progressed, another simulator program that would achieve some of the same objectives as the AAJTS program was also moving forward. In August 2012, the active duty Air Force's Simulator Systems Program Office (SIM SPO), at Wright-Patterson AFB, Ohio, issued solicitation number FA8621-12-R-6335. It requested proposals from interested vendors to build a simulator to train Air Force active duty military personnel in close-air-support operations, air traffic control, and call for fire coordination. This

program was known as the Joint Terminal Control Training and Rehearsal System ("JTC TRS") program.

AAJTS and JTC TRS had different Air Force customers: AAJTS for the Air National Guard and JTC TRS for active duty Air Force units. These two customers received separate funding for their respective simulator training programs. If the JTC TRS program was cancelled, the AAJTS program was in a position to benefit financially from a broader base of clients and funding.

The JTC TRS program consisted of three components: Development, Production, and Sustainment. The Air Force expected to purchase 51 devices under the contract and implement additional capabilities, including Distributed Mission Operations connectivity for the Air Force's Air Combat Command (ACC) and Air Force Special Operations Command (AFSOC).

From August 2012 through April 2013, Quantadyn, Bolduc and another QuantaDyn executive were working with Seguin to develop the AAJTS training simulator, as part of the potential TD-1 contract, to train Air National Guard military personnel in close-air-support operations. On February 18, 2013, Quantadyn, Bolduc, and another Quantadyn executive worked with Seguin to establish the AAJTS Production Cost Estimate for Low Rate Production (LRP) for the Air National Guard under the TD-1 contract.

The AAJTS and JTC TRS programs were, at about the same time, both on the trajectory of development, production, and sustainment to provide close - air - support simulation training to the Air Force's military personnel. But the JTC TRS solicitation was farther along in the procurement process than the TD-1 contract that was to be used to procure the AAJTS devices.

**Continuing Efforts to Secure the TD-1 Contract**

As Seguin worked with QuantaDyn, Bolduc and others to prepare for future AAJTS simulator production, he sent an email message to Bolduc, on February 18, 2013, that included the independent government cost estimate for the AAJTS simulator, the subject of the proposed TD-1 Contract. On March 8, 2013, Bolduc texted Seguin that the AAJTS simulator is "our last chance to make money. Let's go out with a bang."

In furtherance of the scheme, from April 2013 through September 2013, Seguin worked with Prime Contractor B's employees to steer the TD-1 contract to Prime Contractor B. Prime Contractor B's employees understood that the AAJTS production orders were to go to Quantadyn by way of subcontract under the TD-1 contract.

On April 24, 2013, in a text message to a Prime Contractor B employee, Seguin asked for the employee's personal email address so that he could send the proposed Quality Assurance Surveillance Plan for the TD-1 contract before GSA published its request for proposals.

On June 28, 2013, GSA issued the performance work statement for the TD-1 contract and requested proposals from approximately 60 contractors, including Prime Contractor B.

The Evaluation Criteria, with Seguin's input, weighted Past Experience (PE) and Technical Approach (TA) over price. These evaluation criteria would end up benefiting Prime Contractor B, whose proposal was $58,516,760 higher than the one other company that submitted a proposal ("Competitor 1").

On August 1, 2013, Bolduc received an internal QuantaDyn email listing bonuses to be paid to seven employees, including $10,000 for Bolduc. The author of the message stated, "You worked hard to get a lot of 'deals' with Keith and company and deserve as much credit as me."

## The Cancellation of the JTC TRS Solicitation

From July 2013 through January 2014, Quantadyn, Bolduc, another QuantaDyn executive, and Seguin implemented a plan for Quantadyn to sell 100 AAJTS devices to the active-duty Air Force, Air National Guard, and Foreign Military Sales. For this plan to succeed, the JTC TRS contract had to be canceled. Seguin and an Air National Guard employee persuaded the Air Force to cancel the JTC TRS solicitation after the Air Force had accepted JTC TRS proposals. On April 4, 2014, the Air Force SIM SPO canceled the JTC TRS solicitation without making an award.

Because the active-duty Air Force's Air Combat Command and Air Force Special Operations Command (AFSOC) would not be able to purchase simulators for their close-air-support training through the cancelled JTC TRS contract, the only viable option for them was to purchase the AAJTS devices from QuantaDyn through the TD-1 contract. In other words, Quantadyn was able to capture 100 percent of the work related to the Air Force's close-air-support training mission. . From 2014 through 2015, Quantadyn received eight orders from Headquarters Air Force and AFSOC that were originally marked for the JTC TRS contract. Quantadyn then leveraged the past experience it had gained through its relationship with Seguin to compete and win the 2016 award of the JTC TRS contract, sustaining Quantadyn's control over 100 percent of the Air Force's close-air-support simulation training through January 2021.

## The Award of the TD-1 Contract

While he was working to cancel the JTC-TRS solicitation, Seguin was about to serve as a member of the GSA source selection team for the TD-1 contract. On August 12, 2013, he signed a non-disclosure agreement and conflict-of-interest declaration form as a member of the source selection team. The next day, Seguin emailed to an employee of Prime Contract B a copy of the form that the source selection team would use to evaluate Prime Contractor B's proposal. The email's subject line read, "fill in sheet."

On August 15, 2013, Seguin, located in Texas, emailed the confidential proposal submitted by Competitor 1, along with a blank source selection team evaluation form, to an employee of Prime Contractor B located in Ohio. Seguin intentionally disclosed confidential source selection information and bid and proposal information in an effort to benefit himself, QuantaDyn, Bolduc, and Prime Contractor B.

In early August 2013, while establishing part number schemes for the AAJTS devices, Bolduc informed another owner of QuantaDyn of the intent to have customers, like Seguin and RTD, direct AAJTS orders through the TD-1 Contract awardee to QuantaDyn. By August 19, 2013, Bolduc and the other owner of QuantaDyn implemented plans to establish a corporation specializing in technical services for a Training System Support Center (TSSC). On September 3, 2013, Bolduc and another owner of QuantaDyn formed a corporation specializing in technical services. Bolduc expected Seguin to direct Contractor Operated Maintenance and Contractor Logistics Support (COMS/CLS) work under the TD-1 contract to Prime Contractor B, which would then award subcontracts to the newly formed technical services company. The COMS/CLS work under the TD-1 contract supported the AAJTS and another training simulator. The work flowed from Prime Contractor B to Quantadyn, and then from Quantadyn to the newly formed technical services company. This specialized work was performed through the Training System Support Center (TSSC), whose technicians maintained the simulators after they were delivered to the military. The other QuantaDyn owner anticipated Quantadyn would receive the COMS/CLS work and helped establish the new company in advance of the TD-1 Contract

On September 16, 2013, one day before the contract award, Seguin emailed Bolduc the independent government cost estimates for TD-1 contract modules 001 through 009. In the email, Seguin told Bolduc to work with an employee at Prime Contractor B "so the quotes [on the initial nine modules] are ready ASAP." Seguin also reminded Bolduc that the quotes could not exceed the available government funding listed on the spreadsheet Seguin provided. Seguin needed the quotes to be ready "ASAP" because the end of the government's fiscal year was fast approaching. The funds might be lost if they were not obligated before the fiscal year ended.

On September 17, 2013, at the request of Seguin and RTD, GSA awarded the TD-1 contract, a $413,395,584 delivery order, to Prime Contractor B through an existing GSA Alliant multiple awards contract. The period of performance was from September 2013 through September 2014, with four option years.

## TD-1 Contract Work Directed to QuantaDyn and Seguin Bribe Payments

Immediately after the GSA award, and as previously agreed between Seguin and Prime Contractor B's employees, Quantadyn and Bolduc exchanged emails with Prime Contractor B about the types of subcontracts Quantadyn preferred to receive from Prime Contractor B.

In April 2014, Prime Contractor B awarded a $75,000,000 Indefinite-Delivery Indefinite Quantity (IDIQ) subcontract to QuantaDyn to work as its subcontractor under the TD-1 contract for the duration of the TD-1 contract.

Except under circumstances that were not present in this case, the law does not permit prime contractors and subcontractors to receive independent government cost estimates, MIPRs, MIPR amounts, or other government budget data prior to preparing their initial bids for submission to the government. Competitive pricing is impossible when a government

representative agrees with a prime contractor and its subcontractor that they will receive all orders, and then informs them how much the government has to spend. Ordinarily, prime contractors use competition between subcontractors to achieve the best price/lowest price in order to maximize prime contractor profit. Prime contractors also develop their pricing independent of the government's pricing. And an agency representative, such as Seguin, cannot and does not tell the prime contractor what price to charge or how much to pay its subcontractor.

On September 25, 2013, Seguin sent an email to an employee of Prime Contractor B, discussing how much money the prime contractor could charge for work performed by QuantaDyn under the TD-1 contract. Prime Contractor B and QuantaDyn proposals for the TD-1 modules, along with related Bolduc, Seguin and Prime Contractor B employees' emails, reveal that, by September 2014, Prime Contractor B's fee for modules passed to QuantaDyn increased from five percent to ten percent.

On February 28, 2014, QuantaDyn sent Simulation Products a check for $60,000. On March 10, 2014, Seguin deposited it into a Simulation Products account at a credit union.

On March 13, 2014, Seguin recommended approval of payment requests that Prime Contractor B had submitted to GSA under modules 1, 4 and 5 of the TD-1 contract.

On September 12, 2015, Seguin sent an email to a Prime Contractor B employee located in Ohio. Seguin provided "target numbers" for 17 upcoming TD-1 modules and said he was working numbers for two others. For each module, Seguin supplied the amount Prime Contractor B would pay QuantaDyn and the amount Prime Contractor B would keep. Prime Contractor B's share was one-tenth of QuantaDyn's share.

Bolduc and QuantaDyn agreed to pay Seguin for his efforts in directing TD-1 contract work and government money to QuantaDyn. QuantaDyn would appear to be paying an engineering company for assembly of metal frames for the AAJTS simulator, as well as engineering services pertaining to factory acceptance testing and site acceptance testing for every completed AAJTS simulator. In truth, QuantaDyn's employees assembled the metal frames and conducted both the factory and site acceptance tests. QuantaDyn's payments to Seguin were bribes.

To further the scheme and conspiracy, and to hide the QuantaDyn payments, Bolduc and QuantaDyn directed Seguin to form a new company. On October 22, 2014 Seguin filed assumed name papers at the County Clerk's Office in New Braunfels, Comal County, Texas for Epic1 Engineering Services. An employee with Prime Contractor B helped Seguin design the Epic1 logo used by Seguin on quotes and invoices sent to QuantaDyn.

On October 29, 2014, Seguin sent a text message to Bolduc's cell phone, stating among other information, "New company name. Epic1 Engineering Services." On November 29, 2014, Seguin exchanged a series of text messages with Bolduc regarding payments from QuantaDyn to Seguin. In those text messages, Bolduc set out a schedule of payments to be made to Seguin.

On December 26, 2014, Seguin opened a business checking account and business savings account for Epic1 ES at a credit union in San Antonio, Texas. The next day Seguin caused a $200,000 QuantaDyn check, dated November 28, 2014 and payable to Epic1 Engineering Services, to be deposited into the new Epic1 Engineering Services checking and savings account at the credit union in San Antonio.

In February 2015, Seguin's spouse used her maiden name to obtain a charter for a limited liability company, Epic1 Engineering Service, LLC, from the Texas Secretary of State.

To further conceal the true nature of the payments Seguin received from Bolduc and QuantaDyn, Seguin created a quote for services to be provided by Epic 1 Engineering Services to QuantaDyn, dated June 1, 2015. Seguin emailed that quote to Bolduc on August 8, 2015. According to the quote, Epic 1 Engineering Services would receive $59,435 per AAJTS device.

From August 8, 2015 through April 25, 2016, Seguin sent or caused to be sent to Bolduc by email nine (9) invoices concerning purported work by Epic 1 Engineering Services in connection with the AAJTS simulator and the TD-1 contract. Between November 28, 2014 and September 10, 2016, Bolduc, acting on behalf of QuantaDyn, made 13 payments to Epic1 Engineering Services for a total of $1,055,206.   Prime Contractor B, QuantaDyn, and Epic1 Engineering Services bank account records, along with GSA contracting files, reveal that the funds originated from GSA accounts associated with the TD-1 contract.

For example, on November 21, 2015 Seguin sent an email message from Epic1 Engineering Services to Bolduc that included an Epic1 invoice for $59,435. On December 18, 2015, Bolduc and QuantaDyn caused a check, number 7787, to be sent to Epic1 Engineering Services in the amount of $59,435.

On February 6, 2016, in furtherance of the scheme and conspiracy, Bolduc emailed an Epic1 Engineering Services sales invoice from Virginia to Seguin in Texas. The invoice was dated March 1, 2016, and the amount payable to Epic1 Engineering Services was $209,746.

On September 9, 2016, Seguin deposited QuantaDyn's check number 8136, in the amount of $59,435.00, into the Epic1 Engineering Services savings account at a credit union. It was the last payment that Seguin deposited into the Epic1 Engineering Services account.

As late as February 14, 2017, Seguin continued to email government-prepared spreadsheets detailing confidential Air Force budgets, and how much the Air National Guard was paying for modules 9, 65, 112 and 116 in the TD-1 contract, to QuantaDyn and Bolduc. Seguin told Bolduc and another QuantaDyn employee to add 18% to 20%, plus the 3% GSA fee, on top of QuantaDyn's proposal to Prime Contractor B.

Financial records of the Epic1 Engineering Services accounts and Seguin's personal accounts do not show that money obtained from QuantaDyn was expended to support any of the matters described in the Epic1 Engineering Services invoices to QuantaDyn. Additionally, QuantaDyn is not aware of any evidence that would support the matters described in the Epic1

Engineering Services invoices.

### Proposed TD-2 Contract

In February 2015, Seguin and RTD proposed to GSA a new $1.2 billion multiple award indefinite-delivery, indefinite-quantity (IDIQ) contract, (TD-2), to replace the TD-1 contract. From then through April 14, 2016, Seguin "served" as GSA COR during the formulation of the solicitation for the TD-2 contract.

At the same time, Seguin also received $790,206 in payments from QuantaDyn. While promoting the new contract, Seguin allowed Bolduc to redraw the GSA solicitation package to his liking, and also disclosed GSA's revised solicitation package to Bolduc months before GSA intended to release it for competition. Seguin followed the same pattern that he had used to fix previous RTD contracts in favor of Bolduc and QuantaDyn.

Senior executives from Prime Contractor B and executives from its parent company coordinated with Quantadyn, Bolduc, and Seguin about the TD-2 contract. In August 2015, a senior official at Prime Contractor B informed Seguin that another senior executive at Prime Contractor B wanted to meet with both Seguin and Bolduc in Sterling, Virginia. Seguin was unable to travel until after the government fiscal year started on October 1, 2015. On October 19, 2015, Bolduc, on behalf of QuantaDyn, met for dinner with two senior executives representing Prime Contractor B and its parent company. They discussed the TD-2 contract over dinner. Prior to this meeting, a person close to Bolduc cautioned him not to say too much about "inside" information during the meeting.

On October 21, 2015, Seguin flew from Texas to Dulles, Virginia on official government travel to meet with a senior executive from Prime Contractor B's parent company who had previously met with Bolduc. A Prime Contractor B employee who assisted Seguin in steering the TD-1 contract to Prime Contractor B traveled to Dulles, Virginia from Ohio to introduce Seguin to the senior executive. On October 22, 2015, Seguin met with a senior executive from the parent company of Prime Contractor B, business development leaders, and the employee from Ohio. They discussed the TD-2 contract, which Seguin was intimately involved with at the time.

The day after this meeting, the senior executive from the parent company who had met with Seguin extended a draft offer for Quantadyn and the parent company to work together as a team to develop a proposal for the TD-2 contract.

By December 15, 2015, GSA had solicited and received information from five potential prime contractors, including QuantaDyn and the parent company of Prime Contractor B. GSA forwarded the responses to Seguin for review and analysis as part of his official duties. On December 17, 2015, QuantaDyn and the parent company of Prime Contractor B signed a teaming agreement to pursue the TD-2 contract together.

On January 25, 2016, Seguin emailed Bolduc a draft of the GSA TD-2 contract solicitation package seeking input, and on January 28, 2016 Bolduc emailed Seguin, providing

his comments on nine sections of GSA's proposed solicitation package. Bolduc proposed changes to make multiple sections more advantageous to contractors. For example, for Section C.18.0, Bolduc said, "demanding a one year warranty of this nature for free is unfair…"  On February 10, 2016, Seguin pasted Bolduc's changes into a new email and sent it to the GSA COs. Seguin told the GSA COs he prepared the comments offline.  A March 28, 2016 GSA revision of the solicitation revealed GSA had incorporated Bolduc/QuantaDyn's changes into the solicitation.

On April 7, 2016, a GSA contracting official sent a copy of the GSA TD-2 solicitation to Seguin at Seguin's request. On April 11, 2016, in furtherance of the scheme and conspiracy, Seguin emailed this GSA TD-2 solicitation, as well as three sample statement-of-objectives templates, from Texas to Bolduc in Virginia.  GSA had not yet released the solicitation for competition.  In his email message, Seguin told Bolduc, "You know what to do."

On April 14, 2016, GSA removed Seguin from his COR authority on the TD-1 contract and the TD-2 solicitation.  Seguin continued to work at RTD, however, where he had access to government computer servers with contract information concerning training simulator projects.

By October 2016, GSA-OIG agents had advised GSA's regional management in Fort Worth that the TD-2 solicitation had been compromised by unauthorized disclosures. Agents disclosed emails in which Seguin released solicitation draft documents to Bolduc.  GSA delayed the TD-2 contract solicitation.

### Seguin's Departure from RTD

In   December   2016,   Seguin   established   a   new   email   account, "spengeneering101@gmail.com" and used this account to communicate with Bolduc and another QuantaDyn employee. Emails between Seguin, Bolduc, and the QuantaDyn employee in January 2017 reveal a plan to create a new position, "Director of Programs," at a QuantaDyn affiliate. Seguin would be hired to fill the position.

On January 23, 2017, Seguin transmitted a Program Engineering Manager job description to the QuantaDyn employee for the new job Seguin intended to fill.  Between January 26 and January 28, 2017, the QuantaDyn employee forwarded Seguin's job description to Bolduc, saying it looked pretty good, but expressing some concerns. Bolduc responded by stating that the description was good enough, that "Bro" (Seguin) was to work primarily for the affiliated company in the near term, that his QuantaDyn duties would be defined, and that "Bro could help both companies immensely and immediately."

On April 5, 2017, Seguin emailed his resume to Bolduc. It omitted any reference to Seguin's businesses, Simulation Fabrication Products, Simulation Products LLC, and Epic 1 Engineering Service LLC. On July 8, 2017, Seguin resigned from his government position after 28 years at RTD. On July 9, 2017, Seguin accepted a salaried position as the Director of Programs with a company associated with QuantaDyn. Seguin would report directly to Bolduc. Seguin's compensation and benefits included an annual salary of $175,000, a $10,000

sign-on bonus, and multiple fringe benefits. Seguin's place of employment was at QuantaDyn's facility in Ashburn, Virginia.

### Resulting Financial Harm to the United States

As a result of the criminal acts described above, the United States experienced at least the following financial losses:

| | |
|---|---|
| Boom Simulator Contract | $115,500.00 |
| CRMT Contract | $450,868.34 |
| TDIT Contract | $1,484,679.26 |
| Prime Contractor B's profit on the TD-1 Contract | $11,471,254.84 |
| Bribes Defendant paid to Seguin and recouped from the United States under the TD-1 Contract | $1,055,206.00 |
| Defendant's profit on the TD-1 Contract | $23,180,205.47 |
| **Total** | **$37,757,713.91** |

I am counsel for Defendant, QuantaDyn Corporation. I have fully explained to Defendant all of Defendant's rights with respect to the pending criminal charge(s). I have carefully reviewed this plea agreement in its entirety with Defendant and provided Defendant with my best professional advice. In my opinion, Defendant's decision to enter into this plea agreement is made freely, voluntarily, and with full knowledge of its obligations and consequences.

DATE: 8/24/20 ,

*Thomas A. Hanusik*

Thomas A. Hanusik
Attorney for Defendant

I, William T. Dunn, Jr., Chief Executive Officer of QuantaDyn Corporation, have carefully read and reviewed the entirety of this plea agreement. After careful consideration and discussion with QuantaDyn Corporation's attorney, and fully understanding QuantaDyn Corporation's rights with respect to the pending criminal charge(s), I freely and voluntarily agree to the specific terms and

conditions of the plea agreement, on behalf of QuantaDyn Corporation, as authorized by a corporate resolution dated August 5, 2020.

DATE: 24 AUG 2020 ,

William T. Dunn, Jr.
Chief Executive Officer
QuantaDyn Corporation
Defendant